# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TEODORO B. BANAWA,<br><br>           Plaintiff,<br>   v.<br><br>MICHAEL J. ASTRUE, Commissioner of Social Security,<br><br>           Defendant. | CASE NO. 09cv2281 BTM(PCL)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

Plaintiff and Defendant have filed cross-motions for summary judgment. For the reasons set forth below, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED**.

## I. PROCEDURAL BACKGROUND

On September 27, 2004, Plaintiff filed an application for a period of disability and disability insurance benefits, alleging disability since September 10, 2004. Plaintiff's application was denied initially and on reconsideration. On Spetember 12, 2006, Plaintiff's claim was heard by Administrative Law Judge David L. Wurzel (the "ALJ"). On August 7, 2007, the ALJ issued a decision denying benefits. (Tr. 11-25.) Plaintiff filed a request for review with the Appeals Council, which was denied. The ALJ's decision then became the final decision of the Commissioner of Social Security. Plaintiff seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

## II. ALJ'S FINDINGS AND CONCLUSIONS

The ALJ found that Plaintiff was fully and currently insured for disability insurance benefits on his alleged onset date of September 10, 2004, and remained insured through the date of the ALJ's decision.

The ALJ found that Plaintiff has the following medically determinable impairments that in combination are considered "severe": obstructive sleep apnea, with excellent compensation on CPAP; moderate degenerative joint disease and levoscoliosis, lumbosacral spine, and mild/Grade 1 retrolisthesis of L3 upon L4; very mild degenerative joint disease, both knees; benign positional vertigo; tinnitus and sensorineural hearing loss, both ears, with excellent speech discrimination bilaterally; bilateral presbyopia and cataract, left eye only, best corrected visual acuity 20/20 right and 20/20 left in February 2006; chronic sinusitis; mild obstructive and reactive pulmonary disease; small external hemorrhoid; and nonsevere seborrheic dermatitis at the hairline.

The ALJ concluded that Plaintiff's impairment or combination of impairments do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ determined that Plaintiff has the residual functional capacity to perform work activity at the light exertional level, with the following nonexertional limitations: never climbing ladders, ropes or scaffolds; never balancing, kneeling, or crawling; occasionally climbing ramps and stairs; occasionally stooping and crouching; no driving on the job; avoiding concentrated exposure to dangerous moving machinery, electric shock, radiation, and unprotected heights; avoiding concentrated exposure to loud work environments; avoiding all jobs requiring keen hearing; and avoiding all jobs requiring sharp visual acuity in both eyes.

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform his past relevant work as a payroll clerk, as generally done in the national economy. Accordingly, the ALJ concluded that Plaintiff has not been under a "disability" as defined in the Social Security Act, at any time from his alleged onset date of September 10, 2004,

through the date of the ALJ's decision.[1]

### III. STANDARD

The Commissioner's denial of benefits may be set aside if it is based on legal error or is not supported by substantial evidence. Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance. Id. Substantial evidence is "relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Flaten v. Secretary of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995).

### IV. DISCUSSION

Plaintiff contends that the ALJ's decision was erroneous because the ALJ (1) improperly rejected the opinions of Plaintiff's treating physicians; (2) failed to provide sufficient reasons for discrediting Plaintiff's pain and symptom testimony; (3) failed to give full consideration to the statements of Plaintiff's wife; (4) failed to afford proper weight to or adequately reject the Vereran's Administration's disability rating of Plaintiff; and (5) erroneously relied on the testimony of the VE without obtaining a reasonable explanation for an apparent conflict between the VE's testimony and the information provided in the Dictionary of Occupational Titles. As discussed below, the Court is not persuaded by any of Plaintiff's arguments.

---

[1] Under the Social Security Regulations, the determination of whether a claimant is disabled within the meaning of the Social Security Act is a five step process. The five steps are as follows: (1) Is the claimant presently working in any substantially gainful activity? If so, then the claimant is not disabled. If not, then the evaluation proceeds to step two. (2) Is the claimant's impairment severe? If not, then the claimant is not disabled. If so, then the evaluation proceeds to step three. (3) Does the impairment "meet or equal" one of a list of specific impairments set forth in Appendix 1 to Subpart P of Part 404? If so, then the claimant is disabled. If not, then the evaluation proceeds to step four. (4) Is the claimant able to do any work that she has done in the past? If so, then the claimant is not disabled. If not, then the evaluation proceeds to step five. (5) Is the claimant able to do any other work? If not, then the claimant is disabled. If, on the other hand, the Commissioner can establish that there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 C.F.R. § 404.1520. See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

**A. Rejection of Treating Physicians' Opinions**

    1. <u>Opinions of Plaintiff's Treating Physicians</u>

        a. <u>Dr. Loredo</u>

Dr. Jose Loredo has been Plaintiff's treating pulmonologist since 2000. In a letter dated September 17, 2004, Dr. Loredo wrote that Plaintiff has been followed at the San Diego VA hospital for obstructive sleep apnea since June of 2000, and explained that despite Plaintiff's compliance with CPAP therapy, Plaintiff has developed severe excessive daytime somnolence. (Tr. 337.) "From his clinical history, it is possible that Mr. Banawa may have developed periodic limb movement during sleep syndrome, a condition that may result in sleep fragmentation and severe daytime somnolence. This condition is currently being diagnosed. I would appreciate [it] if you could assist Mr. Banawa in his quest to obtain financial help due to his disability, since his condition is preventing him from holding full time gainful employment."

On October 18, 2004, Dr. Loredo filled out a "doctor's certificate" in support of Plaintiff's claim for state disability. (Tr. 253.) On the form, Dr. Loredo indicated that Plaintiff's disability began on September 10, 2004, and was expected to last until March 10, 2005. Dr. Loredo listed the primary disease as "periodic limb movement in sleep," and explained that Plaintiff suffered from "persistent debilitating daytime sleepiness despite adequate treatment of obstructive sleep apnea. History of leg movements during sleep." Dr. Loredo further explained: "Patient is finding it difficult to stay awake while driving, which his job requires. Has stopped driving - medical work up is under way."

In a letter dated September 1, 2006, Dr. Loredo stated that despite excellent control of Plaintiff's obstructive sleep apnea, as confirmed by a polysomnogram and CPAP titration conducted on November 5, 2004, and a home sleep study performed on June 1, 2006, Plaintiff continued to complain of excessive daytime somnolence. (Tr. 500.) "Mr. Banawa remains severely limited by persistent excessive daytime somnolence of unclear etiology,

that has prevented him from holding full time gainful employment." Dr. Loredo concluded: "It is unclear why Mr. Banawa continues to have such significant daytime somnolence despite excellent control of his sleep apnea. Our sleep disorders work up over the last few years has not suggested other sleep disorders, other than obstructive sleep apnea. We continue to work with Mr. Banawa in an effort to ameliorate his symptoms."

On a form dated September 22, 2006, Dr. Loredo noted that Plaintiff was diagnosed with "obstructive sleep apnea - severe" and "persistent daytime somnolence despite adequate therapy." (Tr. 547.) In response to questions regarding whether Plaintiff had the ability to perform work at a consistent pace for 8 hours and complete a normal workday and workweek without interruptions from physical symptoms, Dr. Loredo stated that Plaintiff has trouble "maintaining alertness due to sleepiness," "has difficulty staying awake during monotonous tasks," and "will have trouble working in a job that requires constant vigilance." In response to a question regarding Plaintiff's ability to work without needing more than one 5 minute break per hour, Dr. Loredo stated: "[B]reak periods are not needed - patient has trouble maintaining alertness." Dr. Loredo indicated that Plaintiff had moderate limitations with respect to his ability to maintain attention and concentration for extended periods (approximately two-hour segments), to complete a normal workday and workweek without interruptions, and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 548.) In the "Comments" section, Dr. Loredo explained:

> Mr. Banawa is a 58 y/o male with a diagnosis of moderate to severe obstructive sleep apnea since 1996. He has been followed at the San Diego VA Hospital since 2000 for persistent excessive daytime somnolence despite adequate treatment of his sleep apnea. No other sleep disorder has been found. Mr. Banawa has had problems maintaining alertness, especially while driving, which was a requirement in his last job. Physically I do not find Mr. Banawa to have significant limitations; however, his complaint of daytime somnolence appears to interfere with his ability to hold a job that requires constant vigilance or that is very sedentary.

(Tr. 549.)

### b. Dr. Akiwumi

Dr. Cecil Akiwumi, a physician in the Family Practice at the Tricare Outpatient Clinic

in Chula Vista, saw claimant on October 6, 2003, in connection with Plaintiff's complaints of back pain, and on July 21, 2004, to follow up regarding Plaintiff's complaints of dizziness. (Tr. 192, 194.) In a letter to "whom it may concern," dated October 23, 2003, Dr. Akiwumi wrote: "This patient has sleep apnea, arthritis, asthma, spinal disc disease, sinusitis, cataracts. These conditions are related to his service in the Navy. I believe that he should be consider[ed] totally disabled. He has severe difficulties in performing his occupation." (Tr. 195.) In another letter dated June 16, 2004, Dr. Akiwumi stated, "I have spoken to the patient and believe [his] medical conditions interfere with his job. He has to drive to different locations and falls asleep at the job. He has difficulty with vision problems which interfere with driving. I believe he should be totally disabled." (Tr. 191.) On October 15, 2004, Dr. Akiwumi filled out a doctor's certificate in connection with Plaintiff's claim for state disability benefits. (Tr. 254.) Dr. Akiwumi indicated that Plaintiff was disabled from September 10, 2004 to October 13, 2005. Dr. Akiwumi listed the diagnosis as "sleep apnea," and wrote, "[Patient] has difficulty staying awake/ day time sleeping/ snoring." Dr. Akiwumi also identified "osteoarthritis" as another disabling condition.

        c. Dr. Dang

Dr. Tuon C. Dang is a board-certified internist and Plaintiff's primary care physician at the VA Medical Center. In a letter dated April 12, 2005, Dr. Dang wrote that Plaintiff suffers from arthritis of his low back as seen on x-rays done on October 18, 2004, which revealed degenerative disc disease of the lumbar spine with grade one retrolisthesis of L3 on L4. (Tr. 210.) Dr. Dang stated that Plaintiff was currently going to physical therapy and was taking anti-inflammation pills to help with his symptoms. In a letter dated August 29, 2006, Dr. Dang reiterated that Plaintiff suffered from arthritis of his low back and stated, "Per the patient, his symptoms have been progressively worsening over time and is exacerbated by repetitive activities. He also has a history of sleep apnea for which he is seen by the pulmonary sleep clinic." (Tr. 501.)

2. <u>Specific and Legitimate Reasons for ALJ's Rejection of Opinions</u>

Plaintiff contends that the ALJ failed to set forth specific and legitimate reasons for rejecting the opinions of Drs. Loredo, Akiwumi, and Dang. The ALJ did not actually reject any opinion of Dr. Dang. As pointed out by the ALJ, Dr. Dang reported that Plaintiff claimed his symptoms were progressively worsening and exacerbated by repetitive activities, but did not render an opinion regarding whether Plaintiff's complaints were medically supported or whether Plaintiff's medical conditions actually were debilitating.[2] (Tr. 20.) As for the opinions of Drs. Loredo and Akiwumi, the Court finds that the ALJ cited sufficient reasons for rejecting their opinions.

a. <u>Law Governing Treating Physicians' Opinions</u>

As a general matter, opinions of treating physicians are given controlling weight when supported by medically acceptable diagnostic techniques and when not inconsistent with other substantial evidence in the record. <u>See</u> 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Where a treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. <u>Reddick v. Chater</u>, 157 F.3d 715, 725 (9th Cir. 1990). In doing so, the ALJ must do more than proffer his own conclusions – he must set forth his own interpretations and why they are superior to that of the treating physician's. <u>Embrey v. Bowen</u>, 849 F.2d 418, 421-22 (9th Cir. 1988). The ALJ may meet this burden by conducting a detailed and thorough discussion of the facts and conflicting evidence, and by explaining his interpretations and findings. <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th

---

[2] The ALJ viewed Dr. Dang's failure to state that Plaintiff's complaints were consistent with the medical evidence or that Plaintiff's medical conditions were debilitating as "opinions-by-admission." Plaintiff argues that the ALJ erred in doing so because the primary function of medical records is to promote communication and record keeping for health care personnel - not to provide evidence for disability determinations. However, Dr. Dang's letters appear to have been written in connection with a claim of disability by Plaintiff. Therefore, it was not unreasonable for the ALJ to find significance in the fact that Dr. Dang did not state that the medical evidence supported Plaintiff's complaints or that Plaintiff's medical conditions were debilitating. Even if the ALJ placed too much weight on the "opinions-by-admission," such error was harmless because, as discussed below, other evidence supported the ALJ's decision.

Cir. 1989).

Even if the treating physician's opinion is inconsistent with other substantial evidence in the record, the treating physician's opinions are still entitled to deference and must be weighted using the factors provided in 20 C.F.R. § 404.1527. Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); SSR 96-2p. These factors include, inter alia, the "nature and extent of the treatment relationship" between the patient and the treating physician, the "length of the treatment relationship and the frequency of examination," the amount of relevant evidence that supports the opinion and the quality of the explanation provided, and the consistency of the medical opinion with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6).

### b. Dr. Loredo

The ALJ rejected Dr. Loredo's opinion that Plaintiff's excessive daytime somnolence ("EDS") would interfere with Plaintiff's ability to remain awake and alert on the job because Dr. Loredo's opinion that Plaintiff suffered from EDS was based on Plaintiff's subjective complaints and was not supported by the objective medical evidence. The ALJ's reasons for rejecting Dr. Loredo's opinion were specific and legitimate and were supported by substantial evidence in the record.

The ALJ correctly noted that for the most part, the VA's records do not contain observations by Dr. Loredo or other doctors that Plaintiff looked fatigued or was unable to focus. The Court found one progress note dated April 1, 2005, in which Dr. Loredo observed that Plaintiff "does appear tired." (Tr. 385.) This recorded observation of fatigue, however, was the exception. It appears that Dr. Loredo largely relied on Plaintiff's reporting of his symptoms in reaching his opinion that Plaintiff suffered from EDS that interfered with his ability to concentrate and remain alert. As discussed below, the ALJ properly discounted Plaintiff's excessive symptom testimony. Therefore, the ALJ did not err in disregarding Dr. Loredo's opinion. See Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999) ("A physician's opinion of disability premised to a large extent upon the claimant's own

accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted.") (Internal quotation marks and citations omitted).

In addition, Dr. Loredo's opinion was not supported by the medical evidence. As noted by Dr. Loredo, sleep studies conducted in 2004 and 2006 indicated that Plaintiff's sleep apnea was under "excellent control" on CPAP. (Tr. 500.)  The polysomnography conducted on November 2004 showed that Plaintiff "responded extremely well to use of nasal CPAP. On nasal CPAP at 12 cm water pressure, respiration was normal, snoring was eliminated, and sleep continuity was excellent." (Tr. 208.) Similarly, the home sleep study conducted on June 1, 2006, established "[e]xcellent control of severe obstructive sleep apnea at the current CPAP level." (Tr. 347.) As a result of the home sleep study, doctors were asked to instruct Plaintiff "as to the importance [of] increasing CPAP compliance to 7-8 hours per night in order to obtain the full benefit of this efficacious therapy." (Tr. 347.) Dr. Loredo informed Plaintiff that "OSA is a highly treatable disease" and that "when CPAP is properly used for 8-9 hours per night, daytime somnolence will improve, and most patients are able to get back into the work force." (Tr. 385.) A nurse practitioner told Plaintiff the same thing. (Tr. 359.)

Dr. Loredo actually seemed perplexed by the cause of Plaintiff's EDS. In September, 2004, Dr. Loredo noted that Plaintiff's EDS was "in excess of what we would expect from OSA alone." (Tr. 284.) Loredo also noted that Plaintiff's symptoms were suggestive of periodic limb movement syndrome. (Tr. 283, 284.) However, during the November 2004 polysomnography, "No significant periodic leg movements were noted." (Tr. 207.) No other sleep disorder was ever diagnosed. (Tr. 549.)[3]

---

[3] The medical records suggest that improper use of the CPAP equipment and poor sleep habits may have been the cause of any EDS. In August 2004, Dr. Loredo noted: "Persistent excessive daytime somnolence probably due to under treatment with CPAP." (Tr. 286.) In December 2004, Dr. Loredo observed that Plaintiff was using old CPAP equipment that made too much noise and that Plaintiff's CPAP mask was old and worn and missing some components. (Tr. 240.) In April 2005, Plaintiff admitted that he was not using the chin strap even though he opens his mouth while on CPAP, and Dr. Loredo noted, "OSA probably still not optimally controlled due to mouth breathing, and noncompliance with chin strap." (Tr. 385.) Dr. Loredo recommended that Plaintiff start using a full face mask if Plaintiff's wife notices that Plaintiff is still opening his mouth. (Id.) Dr. Loredo also noted that Plaintiff had "poor sleep hygiene" and prescribed a rigid sleep schedule. (Id.) In July 2005, Plaintiff

In sum, Plaintiff's treating records did not establish a medical reason for his EDS, and Loredo's opinion regarding the effect Plaintiff's EDS would have on his work performance was largely based on Plaintiff's subjective complaints, which the ALJ properly discounted. Therefore, the ALJ did not err in refusing to give any weight to Dr. Loredo's opinion.

### c. Dr. Akiwumi

The ALJ rejected Dr. Akiwumi's opinions on the ground that they were conclusory and based on Plaintiff's subjective complaints. The Court does not find fault with the ALJ's reasoning.

Dr. Akiwumi's October 2003 opinion that Plaintiff's various medical conditions rendered him "totally disabled" was conclusory. The letter did not set forth any factual basis for Dr. Akiwumi's opinion. The letter did not describe the functional limitations resulting from Plaintiff's medical conditions and did not refer to medical evidence supporting a finding of disability. The disability determination is reserved to the Commissioner, and a statement by a medical source that a claimant is "disabled" or "unable to work" is not accorded the weight of a medical opinion. 20 C.F.R. § 404.1527(e)(1).

Dr. Akiwumi's June 2004 letter stated: "I have spoken to the patient and believe [his] medical conditions interfere with his job. He has to drive to different locations and falls asleep at the job. He has difficulty with vision problems which interfere with driving. I believe he should be totally disabled." Dr. Akiwumi did not treat Plaintiff for sleep apnea, and it is

---

admitted that he "forgot to use chin strap," and the nurse practitioner indicated that Plaintiff's continued symptoms were possibly caused by "noncompliance with chin strap and mouth breathing in addition to nocturia." (Tr. 377.) In January 2006, the nurse practitioner noted that Plaintiff still had an irregular sleep schedule, and Plaintiff was again prescribed a rigid sleep schedule. (Tr. 360.) In April 2006, the nurse practitioner noted: "Unclear reasons for continued symptoms, possibly from spending too much time in lower CPAP auto-pressure." (Tr. 359.) The pressure was adjusted, but Plaintiff complained about it. (Tr. 358.) The pressure was readjusted downward, but it was noted that the discomfort was probably due to a mask leak. (Tr. 358.) Plaintiff was instructed to adjust his mask to minimize leaks, and a new shallow nasal mask was ordered for Plaintiff because his old one was "worn and needs to be replaced." (Tr. 359.) At the hearing, Plaintiff testified that he was still using the nasal mask and admitted that it leaked almost every night. (Tr. 62.) Plaintiff explained that he did not want to tighten the strap too much because it would leave an indentation in his face. (Tr. 64.)

apparent that he was wholly relying on Plaintiff's account of his symptoms. Therefore, his opinion regarding the effects of EDS suffered by Plaintiff is not entitled to any weight.[4]

The ALJ also properly rejected Dr. Akiwumi's October 2004 opinion that Plaintiff was disabled due to difficulty staying awake during the day. Again, there is no evidence that Dr. Akiwumi had any independent basis for concluding that Plaintiff suffered from EDS.[5]

### B. Rejection of Plaintiff's Symptom and Pain Testimony

Plaintiff contends that the ALJ failed to provide sufficient reasons for discrediting Plaintiff's symptom and pain testimony. Although not all of the reasons the ALJ provided were valid, the ALJ cited some clear and convincing reasons for rejecting Plaintiff's testimony.

In deciding whether to accept a claimant's subjective symptom testimony, an ALJ must perform two stages of analysis. See Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996). The first stage of analysis is a threshold test set forth in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986). Under this test, the claimant must (1) produce objective medical evidence of an impairment or impairments; and (2) show that the impairment or combination of impairments could reasonably be expected to produce some degree of the symptoms described. Id. at 1407-08.

"Once the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of

---

[4] As for Plaintiff's vision problems, the record does not establish that Plaintiff's eyesight would interfere with his driving. In January 2005, an optometrist found 20/20 vision in the right eye, 20/50+2 in the left eye, and indicated "[u]nable to increase acuity in left eye, pt has central polar cataract OS." (Tr. 234.) But Plaintiff's most recent eye examination in February 2006, indicated corrected vision of 20/20 in the left eye, right eye, and both eyes. (Tr. 413.) At the hearing, Plaintiff said that his vision was good enough to renew his driver's license in 2005, and explained that he uses distance glasses for driving. (Tr. 68, 70.)

[5] The October 2004 doctor's certificate also listed "osteoarthritis" as a debilitating condition. However, it appears that "osteoarthritis" was added to the form as an afterthought. Dr. Akiwumi does not describe any functional limitations resulting from the osteoarthritis. Similarly, Dr. Akiwumi's notes regarding Plaintiff's October 6, 2003 visit for back pain and knee pain lack any detail regarding the severity of the conditions and how they affect Plaintiff. (Tr. 194.)

objective medical evidence to fully corroborate the alleged severity of pain." Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991). This is so even if the claimant testifies that he experiences pain or a symptom to a greater degree than would normally be expected as a result of the medical impairment. Cotton, 799 F.2d at 1407; Swenson v.Sullivan, 876 F.2d 683, 687-88 (9th Cir. 1989).

If the claimant satisfies the Cotton test and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear and convincing reasons for doing so. Smolen, 80 F.3d at 1281. The ALJ must state specifically which symptom testimony is not credible and what facts in the record support that conclusion. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).

Plaintiff's main complaints are of EDS and back pain. When asked by the ALJ why he felt he was unable to work for a living, Plaintiff responded, "Because most often I feel tired and I have difficulty focusing on my job and I have poor memory and I forget things. I complain of, also my back ache." (Tr. 50.)

With respect to Plaintiff's allegations of EDS, the Court finds the following reasons, in combination, to be clear and convincing reasons for not crediting Plaintiff's excess symptom testimony: (1) the objective medical evidence does not support Plaintiff's allegations, but, instead, establishes "excellent control" of Plaintiff's sleep apnea on CPAP; (2) Plaintiff declined to undergo Multiple Sleep Latency Testing to quantify the degree of somnolence he alleged (Tr. 434); (3) Plaintiff declined medication (Provigil/Modafinil) for relief of his alleged symptoms of debilitating daytime sleepiness (Tr. 434); (4) Plaintiff's demeanor undermined his credibility (Tr. 22) (see Thomas v. Barnhart, 278 F.3d 947, 960 (9th Cir. 2002) (ALJ permissibly relied on claimant's demeanor at the hearing in finding her not credible); (5) Plaintiff's admission that he does all the driving for his family, including driving his daughter to school and to after-school activities, tends to contradict his previous claim that he has difficulty staying awake during driving and hardly ever drives. (Tr. 56, 60, 154.)

As for Plaintiff's allegation of disabling back pain, the Court finds the following

reasons, in combination, to be clear and convincing reasons for discounting Plaintiff's pain testimony: (1) X-rays show that degenerative changes in Plaintiff's lumbar spine are only moderate and retrolisthesis of L3 on L4 is mild (Tr. 251-52); (2) surgery has never been suggested to treat Plaintiff's condition; (3) Plaintiff has never taken anything more than over-the-counter medication for orthopedic pain and testified that he had not taken even ibuprofen in months (Tr. 54-56); (4) Plaintiff's physical activities, including jogging/walking for a distance of a mile to a mile-and-a-half two to three times a week, dancing, and occasionally attempting to play basketball are inconsistent with Plaintiff's allegations of disabling back pain (Tr. 219; 294, 354, 536); and (5) Plaintiff's demeanor was not that of a credible person. (Tr. 22.)

The ALJ provided clear and convincing reasons for finding Plaintiff's symptom and pain testimony not credible. Therefore, Plaintiff is not entitled to relief on this ground.

## C. Plaintiff's Wife's Statements

Plaintiff contends that the ALJ failed to give full consideration of statements made by Plaintiff's wife, Lina M. Banawa. The Court finds that the ALJ gave sufficient reasons for discounting Ms. Banawa's statements.

"[F]riends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [his or] her condition." Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993). See also 20 C.F.R. § 416.913(d)(4) (listing spouses as non-medical source that can provide evidence regarding severity of impairment). If the ALJ wishes to discount the testimony of a lay witness, the ALJ must give reasons germane to that witness. Id. at 919.

In her written statement, Ms. Banawa made substantially the same claims of limitation as Plaintiff. Because the ALJ has provided clear and convincing reasons for rejecting Plaintiff's pain and symptom testimony, the ALJ has also provided germane reasons for rejecting Ms. Banawa's testimony. See Valentine v. Comm'r Social Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) ("In light of our conclusion that the ALJ provided clear and

convincing reasons for rejecting Valentine's own subjective complaints, and because Ms. Valentine's testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony.") [6]

### D. VA's Disability Rating

Plaintiff contends that the ALJ erred in ignoring or failing to adequately reject the VA's disability rating of 70%. The Court disagrees.

The Ninth Circuit has held that an ALJ must ordinarily give great weight to a VA determination of disability because of the marked similarity between these two federal disability programs. McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002). However, an ALJ "may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." Id. "The acquisition of new evidence or a properly justified reevaluation of old evidence constitutes a persuasive, specific, and valid reason . . . supported by the record." Valentine, 574 F.3d at 695 (internal quotation marks omitted).

In this case, the ALJ pointed out that by October 6, 2003, Plaintiff's VA disability rating had been raised to 70 percent, of which 50 percent was attributed to sleep apnea. (Tr. 21.) In the same paragraph, the ALJ discussed the fact that there was no medical reason for

---

[6] The additional reasons the ALJ gave for rejecting Ms. Banawa's testimony are not convincing. The ALJ stated that Plaintiff's wife is a biased declarant with a financial motive. However, absent specific evidence that a spouse exaggerated a claimant's symptoms in order to get access to his disability benefits, financial interest is not a valid reason for rejecting testimony of a spouse. Valentine, 574 F.3d at 694. The ALJ also reasoned that Ms. Banawa's claim that her husband cannot walk for half-a-mile without resting is contradicted by his admissions that he jogs, works out at the gym, and goes dancing. Although Plaintiff's level of daily activity does seem somewhat inconsistent with Ms. Banawa's claim, it is unclear whether Plaintiff needs to take frequent breaks when jogging/walking or engaging in other forms of physical exercise. The ALJ also rejected Ms. Banawa's claim that she was "more adept" at money management than her husband given that her husband had a career as a disbursing clerk. However, Ms. Banawa may have meant that she was better at money management simply because of how Plaintiff's purported EDS affects him. In response to the question whether Plaintiff's ability to handle money has changed since the illnesses began, Ms. Banawa checked the box marked "Yes," and explained, "He tends to be forgetful, feel tired and sleepy and unable to concentrate." (Tr. 146.) These errors were harmless, however, given the identity between Ms. Banawa's statements and Plaintiff's statements and the ALJ's identification of clear and convincing reasons for rejecting Plaintiff's pain and symptom testimony.

Plaintiff's EDS because his apnea was under excellent control with CPAP. (Tr. 22.) The sleep studies showing that Plaintiff's apnea was under excellent control with CPAP were conducted in November 2004, and June 2006, after Plaintiff's VA disability rating was raised to 70%. Although the ALJ did not explicitly state that he was relying on medical evidence that the VA did not consider, it is apparent that this is the case. Therefore, the Court concludes that the ALJ provided a persuasive, specific, and valid reason for deviating from the VA disability rating.

### E. Conflict Between VE Testimony and DOT

Plaintiff contends that (1) the VE's testimony that Plaintiff could return to his past relevant work as a payroll clerk conflicted with the DOT; and (2) the ALJ failed to obtain a reasonable explanation from the VE for the apparent conflict.

Under SSR 00-4p, the ALJ has an affirmative duty to ask about "any possible conflict" between the VE's evidence and information provided in the DOT. The ALJ must (1) ask the VE if the evidence he or she provided conflicts with information provided in the DOT; and (2) if the VE's evidence appears to conflict with the DOT, must obtain a reasonable explanation for the apparent conflict. A reasonable explanation for a conflict may be based on information that is not included in the DOT – e.g., information obtained directly from employers or other publications about a particular job's requirements or information based on the VE's own experience in job placement or career counseling. SSR 00-4p.

In Massachi v. Astrue, 486 F.3d 1149 (9th Cir. 2007), the Ninth Circuit held that the ALJ must perform the inquiries under SSR 00-4p before relying on a VE's testimony regarding the requirements of a particular job. If the ALJ fails to do so despite a potential conflict between the VE's testimony and the DOT, the Court cannot determine whether the ALJ's decision that the plaintiff can perform other work was supported by substantial evidence and, therefore, must remand the case. Id. at 1154.

The ALJ in this case specifically told the VE, "If any opinion you have or express differs in any way from what's provided in the Dictionary of Occupational Titles, please note

any such differences and your reason for having a differing opinion. Would you do that please?" (Tr. 79.) The VE replied that he would.

Furthermore, the Court does not find an apparent conflict between the VE's testimony and the information provided by the DOT. The DOT indicates that the job of payroll clerk (215.382-014) requires constant (2/3 or more of the time) near acuity and occasional (up to 1/3 of the time) accommodation. "Near acuity" is defined as "clarity of vision at 20 inches or less." <u>Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles</u> ("SCO"), Appx. C. "Accommodation" is defined as the "[a]djustment of lens of eye to bring an object into sharp focus. This factor is required when doing near point work at varying distances from the eye." <u>Id.</u>

The ALJ advised the VE that Plaintiff could not perform jobs requiring "sharp binocular vision." (Tr. 81.) The ALJ explained that although Plaintiff's right eye was 20/20, his left eye was less than that because of the cataract. Accordingly, Plaintiff could not perform a job, such as an airline pilot, that required "sharp vision in both eyes." (Tr. 81.) The limitation imposed by the ALJ does not conflict with the information contained in the DOT and SCO. The fact that a person has normal vision in one eye and less than normal vision in the other does not mean that he or she cannot see clearly with both eyes at 20 inches or less. This is especially so when the vision impairment at issue is nearsightedness. Plaintiff suffered from *myopia* and testified that he wore distance glasses for driving. (TR 234, 413.) Although he also had presbyopia,[7] which is a normal part of aging, the medical records do not indicate that the presbyopia had reached the stage where it required treatment.[8] Indeed, at the hearing, Plaintiff explained that he did not need glasses to read, an activity he engages in regularly. (Tr. 69.) Plaintiff also explained that he did not plan on having cataract surgery until it interfered with his vision. (Tr. 65.) Because the record did not establish a limitation

---

[7] Presbyopia is a condition associated with aging where the lens of the eye slowly loses its ability to focus on nearby objects. The condition can be corrected with glasses or contact lenses. See http://www.nlm.nih.gov/medlineplus/ency/article/001026.htm.

[8] People with both myopia and presbyopia may be able to see up close by removing their glasses. See http://www.mayoclinic.com/health/presbyopia/DS00589.

on Plaintiff's near acuity and the ALJ did not impose such a limitation in his hypothetical to the VE, there was no conflict between the VE's testimony and the information provided by the DOT and SCO.

Plaintiff also argues that the VE's testimony contradicted the DOT because of Plaintiff's auditory limitations. The ALJ's hypothetical required "[a]voiding concentrated exposure to loud work environments," and "no job requiring *keen* hearing," such as a music mixer. (Tr. 81) (emphasis added). The ALJ clarified that he meant "loud" in the "DOT sense of that term." The DOT indicates that the payroll clerk job involves a "moderate" noise level ("Level 3") and occasionally requires "hearing," although not keen hearing. The SCO gives as examples of "moderate" noise intensity, "business office where type-writers are used; department store; grocery store; light traffic; fast food restaurant at off-hours." SCO, Appx. ID. In contrast, examples of "loud" intensity (Level 4) include "can manufacturing department; large earth-moving equipment; heavy traffic." Id. The requirements of the job, as set forth by DOT and SCO, do not conflict with Plaintiff's limitations of no *keen* hearing and no concentrated exposure to a *loud* work environment.

In conclusion, the ALJ fulfilled his duty to ask the VE if the evidence he provided conflicted with the information provided in the DOT. Furthermore, because there was no apparent conflict between the VE's evidence and the DOT, the ALJ did not need to make any further inquiry.

## V. CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment is **DENIED** and Defendant's motion for summary judgment is **GRANTED**. The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: January 19, 2011

*(signature)*

Honorable Barry Ted Moskowitz
United States District Judge